* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer on or about February 17, 2003.
3. The Industrial Commission has jurisdiction over the parties and the subject matter.
4. All parties have been correctly named and there is no question as to misjoinder or nonjoinder of parties.
5. Plaintiff's average weekly wage is $374.16, yielding a compensation rate of $249.45.
6. Plaintiff's issues for determination were set forth as: "Employer's issues and attorney's fees for defendants' unreasonable prosecution of the claim."
7. Defendant's issues for determination were (a) whether plaintiff unjustifiably refused an offer of suitable employment, (b) whether plaintiff is disabled from working, within the meaning of N.C. Gen. Stat. § 97-2(9) due to his compensable injury; and (c) to what, if any further benefits is plaintiff entitled pursuant to the North Carolina Workers' Compensation Act.
8. At the hearing before the Deputy Commissioner, plaintiff's medical records were admitted into evidence as Stipulated Exhibit 1 (with providers 1 through 9). These were records of Dr. Todd Davis, Health Works, Franklin Orthopaedics, Mission Hospital, Angel Medical Center-Outpatient, Angel Medical Center, Asheville Radiology, Blue Ridge Bone Joint Clinic-Michael J. Goebel, MD, and RTW Services — vocational evaluation by Randy Adams.
9. A bound folder of plaintiff's Exhibits, numbers 1-27, consisting of 95 pages was admitted into evidence as Stipulated Exhibit 2.
10. Subsequent to the hearing before the Deputy Commissioner, an addendum to the Vocational Evaluation dated December 15, 2004 by RTW Services, consisting of a Labor Market Survey dated October 3, 2005 was stipulated into evidence by the parties.
 * * * * * * * * * * *
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 50 years of age. He had completed the eighth grade and obtained a high school equivalency certificate by passing the General Educational Development Test ("GED"). Prior to working at Whitley Products, plaintiff worked as a convenience store cashier, route driver for a food company, security guard, janitor, machine washer and operator, and edger saw operator. He began work for defendant-employer in 2001. Defendant-employer fabricates metal tubing.
2. Prior to his injury, plaintiff worked seventy-five percent of the time as a furnace operator, which required brazing parts, placing them on a belt and then sending them through the furnace. Plaintiff then "bid" on a job and became a full-time furnace operator, which was the job plaintiff was performing at the time of his injury.
3. Prior to his work injury, plaintiff received a verbal warning on February 14, 2003, from Deidre Dills: "poor work performance not meeting required hourly production rates." Plaintiff was told, "his progress will be checked daily from February 17, 2003 through February 28, 2003 for required hourly rates being met." If plaintiff did not reach required hourly rates, the next step of discipline would be taken on March 3, 2003. As plaintiff testified at the hearing before the Deputy Commissioner, he interpreted this to mean that he would be fired if he did not meet hourly quotas. He understood that productivity was a factor in his job and that he needed to work faster.
4. On February 17, 2003, just three days later, plaintiff injured his low back when he was picking up a tub of spacers that weighed more than 40 pounds. Plaintiff testified that he was rushing to try to maintain the required productivity.
5. Defendants accepted plaintiff's claim as compensable and on May 30, 2003 began paying disability benefits at the rate of $118.13 per week based on a Form 60 Employer's Admission of Employee's Right to Compensation. Another Form 60 was submitted to the Industrial Commission on or about October 23, 2003 indicating that temporary total disability payments of $249.45 per week had begun on July 21, 2003.
6. On May 28, 2003, plaintiff presented to Dr. Michael Goebel, an orthopaedic specialist, who subsequently opined that plaintiff had a large herniated disk at L5-S1 that was impinging on his left L5 nerve root. On July 21, 2003, Dr. Goebel performed back surgery on plaintiff. Plaintiff initially improved after surgery, but then seemed to regress and was left with chronic residual back and left leg pain. Dr. Goebel tried physical therapy and medications. Plaintiff currently is on Oxycontin and other medications for management of his pain.
7. On or about January 21, 2004, Dr. Goebel assessed plaintiff at maximum medical improvement. At the same time, Dr. Goebel assigned a fifteen percent permanent impairment (15% PPD) to plaintiff's back and assigned permanent work restrictions to him. These included no lifting greater than 20 pounds, being able to sit or stand as needed, and to use a cane as needed. Dr. Goebel opined that it was unlikely plaintiff would return to his previous occupation and recommended "job retraining would be the best for this individual." Although plaintiff uses a cane to walk, Dr. Goebel did not restrict plaintiff to one-handed work.
8. When plaintiff again presented to Dr. Goebel almost one year later, he voiced basically the same complaints he had previously described. Dr. Goebel has been unable to identify an anatomic reason for plaintiff's complaints, and much of the current basis for plaintiff's complaints is subjective. Dr. Goebel found plaintiff's condition basically unchanged and kept the same restrictions in place.
9. Dr. Goebel testified that plaintiff walks with a limp as a result of decreased sensitivity and numbness in the back of his left foot and a lack of full motor strength. These problems resulted from damage to the L-5 nerve root from the February 17, 2003 work injury, which could lead to falling and the need to use a cane to steady himself. Plaintiff testified that he has fallen several times since his injury, including a fall at the employer's premises.
10. With regard to plaintiff's demeanor, Dr. Goebel described plaintiff as having a flat affect, which could be an indication of depression, possibly caused in part by being worn down by chronic pain. Dr. Goebel opined that while it is possible that the Oxycontin and Flexaril could cloud plaintiff, most people become used to those medications and the symptoms disappear. Dr. Goebel further opined that the drug neurontin could also cloud plaintiff but he has never noted plaintiff to be confused or disoriented on his visits. Dr. Goebel has not restricted plaintiff from driving an automobile.
11. In May 2004, Dr. Goebel reviewed a job description for a grade I machine operator, as well as a physical demands analysis, submitted by defendant-employer. In his letter of May 6, 2004, Dr. Goebel opined that plaintiff should be able to perform this job "under the previously outlined restrictions."
12. The defendant-employer requested that plaintiff return to work in the grade I machine operator position, but plaintiff declined, as he did not believe he could perform the job. According to the testimony of Carlene Michelle Cape, a Human Resource Assistant for defendant-employer, this job can be done either seated or standing. It involves inspecting small parts and then putting them into a tub, which when full weighs around 23 pounds. Ms. Cape testified that people are available to assist in lifting the tub when full, once or twice per hour. Plaintiff would not be able to move the tub when filled, as that would be outside his restrictions. In addition, the Full Commission finds that it would be unlikely plaintiff would be able to meet any production requirements that may be required for this job based upon his prior performance, and the fact that now, when standing, he keeps one hand on his cane.
13. Ms. Cape testified that when plaintiff was offered the inspection job, it was expected that he could do assembly jobs as well. Mr. Ralph Gregory Bell, a manufacturing manager for defendant-employer, testified at the hearing before the Deputy Commissioner that defendant-employer found four different TTA press assembly machine jobs for plaintiff within his work restrictions. Based on Mr. Bell's testimony, it was expected that plaintiff would be moved around to other jobs within the plant.
14. One of the TTA assembly jobs offered to plaintiff would require him to be seated in front of a carousel and feed a tube, braze ring and flange assembly into each station. Although Mr. Bell testified that this job could be done using one-hand, the Full Commission finds that plaintiff would not be able to maintain the same pace as an employee who could use both hands, if he were standing, holding a cane and working only with only one hand.
15. Another of the TTA assembly jobs offered to plaintiff would require operation of a press. A photograph submitted into evidence depicts a seated male using both hands to operate a press. Ms. Cape testified that she did not know if this was a one-handed or two-handed job. While she indicated that one of the palm buttons could be replaced with a foot pedal, she acknowledged that the foot pedal could not be reached if the operator were standing. Mr. Bell testified that this was the TTA pressure test job, which could not be done with one hand, because it has two palm buttons. Ms. Cape testified that there were production requirements for all jobs, but did not know if plaintiff could meet production with one hand.
16. On June 18, 2004, the defendants filed a Form 24 Application to Terminate or Suspend Payment of Compensation with the Industrial Commission. Special Deputy Robert Harris disapproved the Form 24, finding that the position offered to plaintiff had been substantially modified to accommodate plaintiff's work restrictions, and that defendants failed to submit any documentation showing that employers other than defendant-employer would hire plaintiff to do a similar job at a comparable wage. Defendants appealed this decision in a Form 33 Request That Claim be Assigned for Hearing, dated October 6, 2004.
17. In contrast to the testimony of defendant's witnesses, plaintiff testified at the hearing before the Deputy Commissioner that you have to use two hands in every job with defendant-employer, and there is no job in which he could meet production, if he had to alternate sitting and standing, and then, when standing, only use one hand. Plaintiff further testified that he could not remain in one place too long.
18. Plaintiff's counsel retained the services of Randy Adams, a vocational rehabilitation provider, who did a complete Vocational Evaluation consisting of a review of all medical records, a vocational interview, work history, transferable skills analysis, vocational research and objective testing. Mr. Adams did not testify but his vocational evaluation was introduced into evidence.
19. Mr. Adams found that although plaintiff has a high school equivalency certificate, he functions at a much lower level. Mr. Adams administered a Purdue Pegboard examination and found that plaintiff had very low hand and finger dexterity, below the first percentile. Therefore, plaintiff would not be well suited to any type of job that would require him to use his hands and fingers repetitively or to manipulate small parts. On the Beck Depression Inventory, Mr. Adams found indications of severe depression.
20. Mr. Adams concluded that plaintiff had no transferable skills and given his pain profile and restrictions would be relegated to a sedentary level of functioning. Mr. Adams opined that plaintiff was not capable of obtaining or maintaining any substantial gainful employment as it may be found in the local, state or national economy.
21. Mr. Adams also performed a Labor Market survey. He opined that the only category of employment plaintiff might possibly fit that met Dr. Goebel's work restrictions was security guard. He performed a survey of 13 security guard employers in the Western North Carolina area and found no suitable job leads.
22. Based on the competent evidence of record, the Full Commission finds that defendants have failed to offer suitable employment to plaintiff and therefore, plaintiff has not unjustifiably refused their offer. The evidence reveals and the Full Commission so finds that the positions offered to plaintiff would not be suitable given his need to alternately sit and stand and that plaintiff would not be able to meet the expected production standards, given his use of pain medications and his lack of dexterity. Further, if these jobs were modified to accommodate plaintiff's restrictions, they would not be found in the competitive job marketplace.
23. Plaintiff has been unable to return to his prior employment and has been unable to earn the same wages in any other employment since July 21, 2003, and continuing to the present time.
24. The plaintiff received a 15% permanent partial disability (PPD) rating to the back and is entitled to make an election between the more munificent benefit of continuing wage loss or his PPD rating.
25. The Full Commission finds that defendants did not unreasonably defend this claim.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Defendants have failed to prove that they offered suitable employment to plaintiff, or that plaintiff was not justified in refusing to return to work in the positions that were identified. Accordingly, the Form 24 Application to Terminate Benefits was properly denied. Plaintiff did not unjustifiably refuse suitable employment such that his benefits should be suspended. N.C. Gen. Stat. § 97-32; McLean v. EatonCorp., 125 N.C. App. 391 (1997).
2. As a consequence of his compensable back injury on February 17, 2003, plaintiff has been unable to return to his prior position as a furnace operator. Considering his age, education, work experience, pain levels, lack of transferable skills, and restrictions, plaintiff has been unable to earn wages in any employment and has been totally disabled since July 21, 2003. Therefore, plaintiff is entitled to receive ongoing total disability compensation in the amount of $249.45 per week and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff has sustained a fifteen percent permanent partial disability to his back. Plaintiff is entitled to elect the more munificent remedy for his disability. N.C. Gen. Stat. § 97-31(23).
4. As a result of plaintiff's compensable injury by accident on February 17, 2003, plaintiff is entitled to have defendants provide all medical treatment incurred or to be incurred for so long as such evaluations, examinations and treatments may reasonably be required to effect a cure, give relief and will tend to lessen plaintiff's disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
5. Defendants did not unreasonably defend or prosecute this matter; therefore, plaintiff is not entitled to an award of attorneys' fees pursuant to N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee hereinafter approved, defendants shall pay to plaintiff ongoing total disability compensation in the amount of $249.45 per week, continuing until further Order of the Commission. Compensation that has accrued shall be paid in a lump sum also subject to the attorney's fee.
2. Plaintiff has sustained a fifteen percent permanent partial disability to his back. Plaintiff is entitled to elect the more munificent remedy for his disability.
3. As a result of plaintiff's compensable injury by accident on February 17, 2003, defendants shall pay for all medical treatment for so long as such examinations, evaluations and treatment may be reasonably necessary to affect a cure, give relief or lessen plaintiff's period of disability.
4. A reasonable attorney's fee of twenty-five percent (25%) of the lump sum compensation awarded plaintiff in Paragraph 1 of this Award is approved for plaintiff's counsel and shall be deducted from those amounts and payable directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be payable directly to plaintiff's counsel.
3. Defendants did not unreasonably defend or prosecute this matter; therefore, plaintiff is not entitled to an award of attorneys' fees pursuant to N.C. Gen. Stat. § 97-88.1.
4. Defendants shall pay the costs.
This the ___ day of January 2007.
 S/___________________ PAMELA T. YOUNG, COMMISSIONER
CONCURRING:
 S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER